```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA


NATIONAL UNION FIRE                           CIVIL ACTION
INSURANCE COMPANY

VERSUS                                        NO: 09-5884

GULF ISLAND FABRICATION,                      SECTION: J(3)
INC.
```

                        **ORDER AND REASONS**

This is an insurance coverage dispute between National Union Fire Insurance Company and its insured, Gulf Island Fabrication, Inc. National Union filed a declaratory judgment action asking the Court to declare that it does not owe Gulf Island any additional amounts under its policy. Gulf Island counterclaimed for breach of contract, damages, and bad faith penalties. Before the Court are Cross-Motions for Summary Judgment filed by National Union **(Rec. Doc. 36)** and Gulf Island **(Rec. Doc. 38)**.

               **PROCEDURAL HISTORY AND BACKGROUND FACTS**

This matter involves an April 29, 2008, crane collapse at Gulf Island's Aransas Pass, Texas, facility. On that date, four

                                    1

cranes were lifting a piece of machinery as part of the construction of an offshore graving dock when one of the cranes took a side load and its boom twisted and collapsed onto the crane's cab, causing physical damage to the four cranes involved in the lift.  Gulf Island claims that these four cranes were essential to the daily operation of the facility.  The crane whose boom collapsed is referred to as the "C-1 crane."  As a result of this accident, the operator of the C-1 crane was fatally injured.  The instant matter, however, does not involve any liability or wrongful death aspects of the crane collapse.  This litigation is concerned only with what property damages and extra expenses are recoverable under the National Union insurance policy in place on the date of loss.

   National Union insured Gulf Island on the date of the crane collapse under National Union commercial property policy number 263-78-31 (the "2008-2009 National Union policy"), effective from April 15, 2008, to April 15, 2009.  This policy has a liability limit of $110 million.  The 2008-2009 National Union policy was a renewal of the prior year's policy, policy number 261-20-12 (the "prior National Union policy").

   The prior National Union policy contained Endorsement 35 - Rental Reimbursement Endorsement, which stated that Gulf Island

was entitled to reimbursement for expenses actually incurred for the rental of substitute equipment up to a $450,000 coverage sublimit ($15,000 per day for a maximum of 30 days per occurrence).  The prior National Union policy was effective from April 15, 2007, to April 15, 2008.  When the policy was renewed for the 2008-2009 policy year, National Union claims that it was the intent of Willis of Louisiana, Inc., Gulf Island's insurance broker, Gulf Island, and National Union that there be no change to the rental reimbursement coverage and the $450,000 sublimit. The 2008-2009 National Union policy contains a Rental Reimbursement Endorsement (Endorsement 31) that is identical to Endorsement 35 in the prior National Union policy, but the $450,00 sublimit was mistakenly excluded from the 2008-2009 National Union policy.  Gulf Island does not dispute that it was their intent that the 2008-2009 National Union policy contain a $450,000 sublimit for rental reimbursement and that this sublimit was excluded by mutual mistake.  Gulf Island does state, however, that it believed that the $450,000 crane-rental provision, although also available for large crane rentals, was intended for coverage of smaller cranes and other equipment rentals that could be quickly replaced or repaired without Gulf Island having to pay any deductible.

Following the accident on April 29, 2008, Gulf Island immediately took steps to mitigate the loss suffered at the facility by doing what was necessary to continue to operate its business as normally as possible, including the need to rent cranes to substitute for the damaged cranes.  Gulf Island claims that it was instructed by National Union to mitigate its losses and that National Union knew that such mitigation would require Gulf Island to rent cranes.  Gulf Island sought reimbursement under the 2008-2009 National Union policy for these crane rental expenses.

Upon receipt of Gulf Island's claim for the crane collapse, National Union assigned the adjustment of the claim to Ron Crow of McClain Crow & Associates.  National Union also authorized Crow to retain Ruben Castilla with RGL Forensics to assist with the accounting side of Gulf Island's claim.  Crow made his initial inspection of the crane loss on April 30, 2008, but that inspection was limited due to OSHA's involvement in an investigation concerning the death of the crane operator.

Crow worked with Gulf Island and Willis throughout the summer and fall of 2008 adjusting Gulf Island's claim.  On July 3, 2008, and August 7, 2008, National Union issued Reservation-of-Rights letters to Gulf Island, which Gulf Island claims

included instructions to mitigate any loss and did not mention a sublimit for crane rental reimbursement. In fact, Gulf Island claims that Crow believed that there was coverage available under the policy for crane rental expenses as an extra expense and that Gulf Island was led to believe that there was ample coverage available under several of the $110 million policy coverage provisions, including Extra Expense, Property Damage, Business Interruption, and Continuing Rental Expense.

On November 10, 2008, Willis requested a $4,782,000 advance (and submitted replacement crane costs totaling $3,459,807.78) on behalf of Gulf Island. Based on the verified information provided by Gulf Island at that time, and considering application of the appropriate deductibles, Crow recommended an unallocated partial payment of $2,000,000 on November 20, 2008. After reviewing Crow's recommendation and the documentation submitted, National Union issued an unallocated advance partial payment of $2,000,000 on December 13, 2008. After further investigation and submission of additional information (including additional estimates of replacement crane costs of $5,821,691 from Gulf Island), Crow recommended a second unallocated advance of $4,500,000 on January 24, 2009. National Union issued payment of this amount on January 27, 2009.

Sometime in June or early July 2009, John Roberts, National Union's claim handler, met with Crow and Castilla to review Castilla's accounting schedules for Gulf Island's claim. It was at this meeting that National Union discovered that the 2008-2009 National Union policy was missing the rental reimbursement $450,000 sublimit. Roberts spoke to the underwriter on Gulf Island's policy and learned that there had been a misprint in the 2008-2009 National Union policy and that it had been intended that the policy include this sublimit.

Upon discovering this mistake and after internal review, Roberts emailed Mark Maxwell, the Willis claims consultant handling Gulf Island's loss on its behalf, and informed him that Endorsement 31 specifically restricted the amount of coverage with respect to the rental of replacement cranes to $450,000, such that no further monies were owed on Gulf Island's claim. David Passman, Willis' National Property Director, responded to Roberts' email and stated that Willis believed other provisions of the National Union policy could provide coverage for crane rental expenses. Roberts then reiterated that it was National Union's position that the $450,000 rental reimbursement sublimit would apply to limit Gulf Island's claim for crane rental expenses.

National Union filed a declaratory judgment action seeking to reform the 2008-2009 National Union policy to include the $450,000 sublimit and a declaration that National Union does not owe Gulf Island any additional amounts for its crane loss.  After filing this complaint, no further adjustments of any parts of Gulf Island's claim were made until January 25, 2010, when the C-1 crane was released from the court order that had prohibited its inspection.  Following the inspection, Gulf Island received correspondence from National Union in June 2010 and subsequently requested payment for the replacement of the C-1 crane as it was a "constructive total loss."  National Union refused payment and had already allocated the previous advances of $6.5 million to other parts of Gulf Island's claim.  The remaining balance of these $6.5 million advances was used to compensate Gulf Island for the actual cash value ("ACV") of the C-1 crane instead of the replacement cost value ("RCV").

Gulf Island filed a counterclaim, averring that National Union breached its insurance contract by refusing to pay Gulf Island additional amounts it alleges it is owed for the loss of the C-1 crane and that National Union is liable for bad faith penalties for its handling of Gulf Island's claim.  The parties agreed to file the instant Cross-Motions for Summary Judgment

(Rec. Docs. 36 and 38).  In the event the Court determines that any issue is not appropriate for determination on summary judgment, the parties agree to a bench trial on any remaining issues.

## DISCUSSION

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986).

National Union and Gulf Island do not dispute the validity of the 2008-2009 National Union policy, the fact that the $450,000 sublimit on reimbursement for rental expenses was excluded from the policy by mutual mistake, the fact that functioning cranes are essential to the operation of Gulf Island's business, the amount of money Gulf Island has spent on crane rental expenses for which it is now seeking reimbursement,

or the fact that the C-1 crane was not repaired within the two-year time period required by the 2008-2009 National Union policy due to a court-ordered quarantine.  The parties, however, disagree on the correct legal interpretation of the 2008-2009 National Union policy provisions and whether National Union's conduct entitles Gulf Island to bad faith penalties.

**Choice of Law Issue**

National Union argues that the 2008-2009 National Union policy should be interpreted according to Louisiana law, but Gulf Island states that Texas law should apply.  Under Louisiana's choice-of-law rules, Article 3537 is the general choice of law rule for conventional obligations in Louisiana.  LA. CIV. CODE art. 3537 (2011).  When applying the factors listed in Article 3537 to the conventional obligation of insurance contracts, the Fifth Circuit Court of Appeals has held that an insurance contract is governed by the law of the state in which the insurance policy was delivered, which means the state where the policy was executed.  <u>United Fire & Cas. Co. v. Hixson Bros., Inc.</u>, 453 F.3d 283, 285 (5th Cir. 2006); <u>Adams v. Unione Mediterranea di Sicurta</u>, 220 F.3d 659, 678 (5th Cir. 2000); <u>Woodfield v. Bowman</u>, 193 F.3d 354, 360 (5th Cir. 1999).  In this case it appears that the 2008-2009 National Union policy was delivered and executed in

Louisiana, so Louisiana law should apply to interpret the policy provisions.

**Reformation of the 2008-2009 National Union Policy**

Reformation is an equitable remedy used to correct errors or mistakes in contracts when the instruments as written do not reflect the true intent of the parties.  WMC Mortgage Corp. v. Weatherly, 963 So.2d 314, 316 (La. App. 3 Cir. 2007).  The party seeking reformation bears the burden of proving that the error or mistake was mutual.  Id.  In this case, National Union is seeking reformation of the contract, so it bears the burden of proving that the exclusion of the $450,000 sublimit from the Rental Reimbursement Endorsement was a mutual mistake.  National Union has met this burden because Gulf Island does not dispute the fact that both parties intended that the 2008-2009 National Union policy would contain a $450,000 sublimit for reimbursement of rental expenses.  The parties simply dispute the application of that sublimit provision.  Because the exclusion of the $450,000 sublimit was a mutual mistake that does not reflect the intent of National Union and Gulf Island, the Court will reform the 2008-2009 National Union policy to include this $450,000 sublimit for reimbursement of rental expenses.

**Coverage for Gulf Island's Rental Reimbursement Expenses**

The crux of the dispute between National Union and Gulf Island is over the applicability of the $450,000 sublimit on reimbursement for rental expenses in the 2008-2009 National Union policy.  National Union argues that the contract is clear and unambiguous, so it should be enforced as written and exclude reimbursement for rental expenses beyond the $450,000 sublimit. Interpreting the policy otherwise would be contradictory to the idea of sublimits themselves.  Gulf Island argues that courts should consider the intent of the parties when interpreting a contract, so various provisions in the 2008-2009 National Union policy, mainly the Business Interruption and Extra Expense Endorsements, can provide coverage for the crane rental expenses. Interpreting the contract otherwise would allow National Union to successfully enforce a sublimit of $450,000 as an exclusive cap for crane rental expenses when the potential alternative to renting cranes would have been to shut down Gulf Island's business, in which case the covered claim for business interruption alone would have been $16 million (the full amount of coverage under the Business Interruption Endorsement).

An insurance policy is a contract between the insured and the insurer, and it has the force and effect of law between the

parties. La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co., 630 So. 2d 759, 763 (La. 1994); see LA. CIV. CODE art. 1983 (2011); see also LA. CIV. CODE art. 1901 (2010). Insurance policies are controlled by the rules of interpretation and construction that are generally applicable to contracts. La. Ins. Guar. Ass'n, 630 So. 2d at 763. Accordingly, the words used in an insurance policy are to be given their "general, ordinary, plain, and popular meaning . . . ." Id.; see LA. CIV. CODE art. 2047 (2011). The determination of whether a contract is clear or ambiguous is a question of law for the courts to decide. La. Ins. Guar. Ass'n, 630 So. 2d at 764. If an insurance policy is clear and unambiguous, then it must be enforced as written. Id.; see LA. CIV. CODE art. 2046 (2011).

In this case, with the reformation of the 2008-2009 National Union policy to include the $450,000 sublimit for rental reimbursement expenses, the Court finds that the contract between the parties clearly and unambiguously creates a cap of $450,000 on rental reimbursement expenses. The plain language of the 2008-2009 National Union policy establishes specific endorsements and sublimits of coverage for various categories of loss, and these provisions serve a particular purpose—to set exclusive limits of coverage for specific losses within the overall

insurance policy. Interpreting the 2008-2009 National Union policy otherwise would be to ignore the fundamental purpose of the $450,000 rental reimbursement sublimit, as well as the other sublimits within the policy. Because the Court finds that the language of the $450,000 sublimit is clear and unambiguous, it must be enforced as written. Thus, Gulf Island is not entitled to recover more than $450,000 for its crane rental expenses, and National Union correctly allocated its advance payments of $6.5 million to cover Gulf Island's other claims.

Gulf Island also argues that, even if the $450,000 sublimit is a cap on coverage, National Union acquiesced to rental reimbursement coverage in excess of $450,000 because it instructed Gulf Island to mitigate its damages, its Reservation-of-Rights letters did not mention the $450,000 sublimit, and it made advance payments of $6.5 million before realizing that the sublimit was mistakenly excluded from the 2008-2009 National Union policy. Gulf Island suggests acquiescence based on some sort of estoppel or detrimental reliance theory.

The three elements of estoppel are (1) a representation by conduct or word, (2) justifiable reliance on that representation, and (3) a change in position to one's detriment because of that justifiable reliance. <u>Wilkinson v. Wilkinson</u>, 323 So. 2d 120,

126 (La. 1975).  Similarly, in order to recover damages for detrimental reliance, a party must prove (1) the existence of a promise and (2) reasonable reliance on that promise to the party's detriment.  <u>Magic Moments Pizza, Inc. v. La. Rest. Ass'n</u>, 819 So. 2d 1146, 1149 (La. App. 5 Cir. 2002).

   The undisputed evidence in this case does not support Gulf Island's claim based either estoppel or detrimental reliance.  The second elements of both estoppel and detrimental reliance require Gulf Island to show that it "justifiably" or "reasonably" relied on a "representation" or "promise" made by National Union that the $450,000 rental reimbursement sublimit would not act as a cap on recovery for such expenses.  Gulf Island cannot meet this element of each cause of action, however, because it intended to include the $450,000 sublimit in the 2008-2009 National Union policy.  The language of the 2008-2009 National Union policy is clear and unambiguous, was negotiated by two sophisticated parties, and was intended by both parties to include a $450,000 cap on recovery for rental reimbursement expenses.  Thus, Gulf Island cannot show that it "justifiably" or "reasonably" relied on any actions by National Union to the contrary.

**Coverage for the Damage to the C-1 Crane**

Regarding the proper valuation of the C-1 crane, National Union and Gulf Island disagree over whether ACV or RCV is the appropriate calculation.  The plain language of the 2008-2009 National Union policy states that RCV is recoverable if repair or replacement occurs within two years of the loss.  National Union argues that coverage for the C-1 crane is limited to ACV because Gulf Island did not comply with this policy provision.  Repair or replacement did not occur in the two-year period because the C-1 crane was under quarantine by OSHA.  This quarantine is the basis for Gulf Island's argument that RCV should still be recoverable because it was prevented from complying with the two-year repair or replacement period.

Based on the plain language of the 2008-2009 National Union policy, Gulf Island is precluded from recovering RCV for the C-1 crane.  The plain language of the Replacement Cost Endorsement states that the two-year repair or replacement period applies regardless of other events, and the insured had the option of seeking an extension of time within which to repair or replace the property.  Gulf Island did not repair or replace the C-1 crane within the applicable two-year period, regardless of the court-ordered quarantine, and did not request an extension of

time.  Thus, Gulf Island cannot recover RCV for the C-1 crane. Instead, ACV is the appropriate calculation.

The undisputed evidence shows that National Union has adequately compensated Gulf Island for the ACV of the C-1 crane. National Union initially allocated $1,655,810.38 for the ACV of the C-1 crane from the $6.5 million advance payments it made before applying the $450,000 rental reimbursement sublimit to Gulf Island's claim.  This figure was based on National Union's calculation of the ACV for the C-1 crane at $1,839,789.21 minus a ten percent deductible included in the 2008-2009 National Union policy.  Then, National Union hired an expert to determine the ACV of the C-1 crane assuming that the crane is a total loss (which National Union does not concede), and it made an additional payment to Gulf Island in December 2010 based on this calculation.  The expert determined that the ACV for the total loss of the C-1 crane would be $3,089,771.43, and, after accounting for an applicable ten percent property damage deductible, the ACV payment for the total loss of the C-1 crane would be $2,780,794.29.  Based on this calculation, National Union paid the balance of the ACV for the total loss of the C-1 crane ($2,780,794.29) minus the amount it had already allocated ($1,655,810.38), which was an additional  payment of

$1,124,983.91. These two payments of $1,655,810.38 and $1,124,983.91 represent the full amount of any recovery to which Gulf Island is entitled under the ACV provision of the policy.

The only evidence Gulf Island introduces to refute these calculations is an initial estimate of $3.5 million in repair costs to the C-1 crane that it provided to National Union, and it relies on this estimate of repair costs to argue that it has not been adequately compensated for the C-1 crane. The Court finds that this initial repair estimate is irrelevant because (1) the repairs to the C-1 crane were never performed during the applicable two-year contract period and (2) repair estimates are not applicable to ACV calculations.

**Bad Faith Penalties**

Because Louisiana law applies to the interpretation of the 2008-2009 National Union policy provisions, Louisiana law (not Texas law) also applies when determining whether National Union is subject to bad faith penalties for its handling of Gulf Island's claim under the contract. Louisiana jurisprudence recognizes the right of insurance companies to litigate questionable claims without being subject to damages or penalties. See Darby v. Safeco Ins. Co. of Am., 545 So. 2d 1022, 1029 (La. 1989); see also Delahoussaye v. Madere, 733 So. 2d 679,

689 (La. App. 5 Cir. 1999). The Court finds that Gulf Island's claims for bad faith penalties must be denied because the $450,000 sublimit unambiguously provided a cap on Gulf Island's recovery for rental reimbursement expenses, and National Union reasonably applied this correct interpretation of the 2008-2009 National Union policy when disputing Gulf Island's claim and allocating its $6.5 million advance payments to Gulf Island's other claims. Thus, National Union's refusal to pay more than $450,000 for Gulf Island's rental reimbursement expenses was not arbitrary or capricious, and bad faith penalties are not appropriate.

Accordingly, **IT IS ORDERED** that National Union's **Motion for Summary Judgment (Rec. Doc. 36)** is **GRANTED**, and Gulf Island's **Motion for Summary Judgment (Rec. Doc. 38)** is **DENIED**.

New Orleans, Louisiana, this 8th day of April, 2011.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE